Gen. 331]												331

## RACING

### CONSTITUTIONAL LAW − SEARCH AND SEIZURE − DRUGS AND DRUG TESTING − RANDOM DRUG TESTING OF LICENSEES WHO HAVE CONTACT WITH HORSES IS CONSTITUTIONAL

January 8, 1993

*Mr. Joseph E. Owens*
*Deputy Secretary*
*Department of Licensing and Regulation*

On behalf of the Maryland Racing Commission ("Commission"), you have requested our opinion on the legality and constitutionality of Commission regulations that would subject its licensees to random, suspicionless drug testing. Currently, a licensee is required to submit to a urinalysis drug test if so ordered by the Commission or its stewards or judges, provided that such an order is founded upon "reasonable cause" (COMAR 09.10.01.11(d)(2) – thoroughbred racing) or "reasonable suspicion" (COMAR 09.10.02.41(H)(2) – standardbred racing).[1]

For the reasons stated below, we conclude that regulations providing for the random, suspicionless drug testing of those licensees who regularly come in direct contact with a horse, either in its training for, or participation in, a race, would be constitutional under applicable Fourth Amendment standards. With regard to all other licensees, individualized suspicion, as required under the Commission's current regulations, must serve as a predicate to directing the licensee to submit to a drug test.[2]

---

[1] In addition to these drug testing provisions, COMAR 09.10.02.41(I)(1) provides that an individual scheduled to drive in a harness (standardbred) race and any licensed Commission or race track employee having official duties relating to such races are deemed to have consented to a breathalizer "or any other noninvasive test for alcohol." There is no comparable regulation regarding thoroughbred racing.

[2] Previously we have opined that the rationale in support of *categorical* drug testing (*i.e.* testing certain categories of employees, but

(continued...)

## I

## Introduction

The legality of random drug testing is not a novel issue for this office. In a 1986 opinion, Attorney General Sachs concluded, in part, that the Fourth Amendment's prohibition against "unreasonable searches and seizures" does not permit suspicionless testing of most State employees; instead, probable cause first must be established. 71 *Opinions of the Attorney General* 58 (1986). The opinion further noted, however, that drug testing premised upon less than probable cause *was* "reasonable" regarding those State employees whose work was directly related to public safety; these employees could be tested if there existed a "reasonable basis" upon which to suspect illicit drug use. 71 *Opinions of the Attorney General* at 86.

In 1989 it became necessary to re-visit this issue in light of the companion cases of the Supreme Court regarding government-ordered drug testing in *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 109 S.Ct. 1402 (1989) and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384 (1989). In these cases, the Supreme Court first referred to prior decisions holding that the Fourth Amendment proscribes only those searches that are unreasonable; that reasonableness traditionally has been judged by balancing the intrusion on an individual's expectation of privacy against the promotion of legitimate governmental interests; that in most criminal cases, a search is not reasonable unless accomplished pursuant to a judicial warrant based upon probable cause; and that, in non-criminal cases, a search based only on "some quantum of individualized suspicion" nevertheless may be reasonable if "special needs" make the warrant and probable cause requirements impractical. Then, taking the "balancing test" one step further, the Supreme Court held that, in limited circumstances, a search may be reasonable under the Fourth Amendment despite the absence of individualized suspicion:

---

[2] (...continued)
not others) without individualized suspicion is equally applicable and supportive of the rationale in support of *random* drug testing. 75 *Opinions of the Attorney General* 110, 113 (1990). *See also Harmon v. Thornburgh*, 878 F.2d 484, 489 (D.C. Cir. 1989).

> In limited circumstances, where the privacy
> interests implicated by the search are minimal,
> and where an important governmental interest
> furthered by the intrusion would be placed in
> jeopardy by a requirement of individualized
> suspicion, a search may be reasonable despite
> the absence of such suspicion.

*Skinner*, 489 U.S. at 624. *See generally* 1 Marquette Sports L. J., *Random Drug Testing* 41 (1990).

Applying the standards set forth by the Supreme Court in these plurality opinions, we concluded that State employees holding "sensitive positions" may be made subject to drug testing without individualized suspicion. 74 *Opinions of the Attorney General* 119 (1989). A discussion of the categories of State employees that may be deemed to hold "sensitive positions" and therefore to subject to random drug testing is set forth in 75 *Opinions of the Attorney General* 110 (1990).[3]

Thus, to determine the constitutionality of a requirment that Commission licensees submit to random drug testing, one must determine the "reasonableness" of such a search by striking a balance between (i) the interests of the individuals subject to such testing in preserving their physical privacy and (ii) the interests of the State that would be furthered by random drug testing and that would be placed in jeopardy by a requirement of individualized suspicion.

---

[3] Applying the balancing test prescribed by the Supreme Court, both the Maryland Court of Appeals and the Fourth Circuit Court of Appeals have found random drug testing programs to be "reasonable." *See Annapolis v. United Food*, 317 Md. 544 (1989) (police officers and firefighters); *Thompson v. Marsh*, 884 F.2d 113 (4th Cir. 1989) (civilian employees at a chemical weapons plant).

## II

## The Balancing Test Applied to Horse Racing

### A.    *Expectation of Privacy*

The more pervasively an industry is regulated, the less a participant in the industry can expect or anticipate privacy. *Skinner,* 489 U.S. at 627.  Considering that most horse racing in Maryland encompasses legalized gambling, pervasive regulation is essential. *Greenfeld v. Maryland Jockey Club*, 190 Md. 96, 104-05, 57 A.2d 335 (1948).[4]  Accordingly, the General Assembly has vested the Commission with "the powers necessary or proper to enable it to carry out fully all the purposes of [the laws dealing with horse racing in Maryland]." §11-209(a) of the Business Regulation Article ("BR" Article).  In addition, the General Assembly has bestowed upon the Commission the "full power to prescribe rules, regulations and conditions under which all horse races shall be conducted within the State of Maryland." BR §11-210(a)(1).  The Commission generally may regulate all matters pertaining to horse races "in order that they may be conducted fairly, decently and [cleanly] ...." *Jacobson v. Maryland Racing Commission*, 261 Md. 180, 183, 274 A.2d 102 (1971) (quoting *Mahoney v. Byers*, 187 Md. 81, 84, 48 A.2d 600 (1946).  See also *Brann v. Mahony*, 187 Md. 89, 102-03, 48 A.2d 605 (1946).[5]  In short, "horse racing is an endeavor and undertaking that necessarily must be the subject of intensive, extensive and minute regulation." *Jacobson v. Maryland Racing Commission*, 261 Md. at 183. *See also Heft v. Maryland Racing Commission*, 323 Md. 257, 263-64, 592 A.2d 1110 (1991).  One who participates in horse racing must acknowledge the sport's pervasive regulation, and, concomitantly, the participant's diminished expectation of privacy.

---

[4] The Commission's authority extends only to horse racing that is permitted for any stake, purse or reward and does not apply to steeplechase or hunt-type races unless pari-mutuel betting is conducted. §11-103 of the Business Regulation Article.

[5] The regulations promulgated by the Commission in regard to horse racing in Maryland are codified as COMAR 09.10.01.01 through COMAR 09.10.01.81 (thoroughbred) and COMAR 09.10.02.01 through COMAR 09.10.02.56 (standardbred).

Another consideration regarding privacy addressed by the courts is the procedure used in the taking and subsequent analysis of the urine sample. Although suggesting that the collection of urine is no more intrusive or invasive than the collection of blood, the Supreme Court has acknowledged that excretory functions traditionally are shielded by privacy. *Cf. Schmerber v. California*, 384 U.S. 757 (1966). Nevertheless, regulations that endeavor to reduce intrusiveness may minimize threats to justifiable expectations of privacy. *Skinner*, 489 U.S. at 627. For example, intrusiveness may be minimized by not requiring visual observation of the act of urination. *Von Raab,* 489 U.S. at 663. Limiting the examination of the urine sample to specific drugs, instead of a more general analysis that might reveal other medical facts, also minimizes privacy loss. Finally, careful control of the confidentiality of test results is significant. *Von Raab,* 489 U.S. at 672.

## B.    *Governmental Interests*

The interests of the State in the sport of horse racing, where legalized gambling is integral to the sport, are self-evident. In your letter requesting this opinion, you state:

> [T]he Commission, as well as the horsemen themselves, note an ever-increasing incidence of drug use by individuals in the backstretch area of the race tracks, and the possible inadvertent contamination of horses as a result thereof. Patently, resultant positive drug tests of horses impugn not only the integrity of the trainer of the horse, but the sport of horse racing itself – a factor that, the Commission believes, must be minimized to the greatest extent possible in this arena of legalized gambling.

There can be no question of the need to preserve both the fact and the appearance of integrity in horse racing. As stated by the Third Circuit in *Shoemaker v. Handel*, 795 F.2d 1136, 1142 (3d Cir.), *cert. denied,* 479 U.S. 986 (1986), "[p]ublic confidence forms the foundation for the success of an industry based on wagering." If participants in horse racing are under the influence of, or addicted to, illegal drugs, or are more amenable to involvement in corrupt

practices in exchange for access to drugs, the public perception of the integrity of horse racing – its very life-blood – would quickly dissipate. The loss of integrity would result in a severe and drastic downward spiral effect: The public would wager less money, resulting in smaller purses to be earned by the horsemen;[6] smaller purses would result in owners' and trainers' racing their horses elsewhere for greater financial reward; fewer horses would result in small fields, which are less attractive to the wagering public; as a result, less money would be wagered; less money wagered would mean smaller purses, in perpetuation of the downward spiral.

The State also has an interest in preserving its fiscal stake in horse racing. In 1991, horse racing in Maryland generated approximately $5,000,000 in direct revenues to the State. Annual Report of the Maryland Racing Commission 1991. In addition, other indirect economic benefits inure to the State from the multitude of individuals who comprise the horse racing industry (reputed to be the third largest industry in this State), like horse breeders, farmers, veterinarians, blacksmiths, saddleries, and feed companies.

The safety factor is perhaps the most significant of the State's interests. A jockey astride a one thousand pound animal, or a harness driver being pulled in a cart, travelling at 30 to 40 miles per hour in close quarters, faces obvious dangers. Exercise riders, who gallop or "breeze" horses in the morning, endure similar dangers, particularly when horses are being run or walked in different directions throughout different areas of the racing surface. Assistant starters (who help the jockey control the horse in the starting gate), pony boys and girls (who help the jockey control the horse while the horse warms up before the race), and outriders (who lead the horse from the paddock to the track and corral a runaway horse that may have thrown its rider) similarly are exposed to dangers. The starter is in no danger himself, but if he starts a race before all horses are facing forward in the starting gate, poised to run, he can provoke an accident that might crush a jockey or an assistant starter. *Dimeo v. Griffin*, 943 F.2d 679, 683 (7th Cir. 1991) (en banc). Trainers, assistant trainers, veterinarians, grooms, hot walkers, blacksmiths, and others, who, in their respective roles, are required to maintain control of a horse, likewise endure certain dangers if the horse

---

[6] The purses are funded by a portion of the money wagered. BR §11-515.

should bolt, rear, kick, or bite upon improper handling. Considering that drug use may impair alertness, slow reflexes, or impair judgment, such effects endanger not only the individual riding, driving, or caring for a horse but also all others in the vicinity.

These government interests are jeopardized by a requirement of individualized suspicion. A licensee addicted to, or under the influence of, drugs often may not display any outward signs of such a condition, and, accordingly, not provide any basis for a showing of probable cause or reasonable suspicion. In such instances, it may be only after a tragic accident on the race track, caused by even a momentary lapse of attention, or only after integrity violations have impugned the industry, that an articulable basis for testing becomes apparent. Random testing, on the other hand, particularly where all licensees are put on notice that their drug use may be discovered, serves as an effective deterrent toward achieving the desired governmental interests. *Skinner*, 489 U.S. at 630.


## III

### Case Law

Random drug testing, as it applies to the horse racing industry, has been held to be reasonable and thus in compliance with the Fourth Amendment by every federal and State court that has considered the issue after *Von Raab* and *Skinner*.

In *Shoemaker v. Handel*, 795 F.2d 1136, 1142 (3d Cir.), *cert. denied*, 479 U.S. 986 (1986), the Third Circuit prophetically applied a "balancing test" analysis in determining the constitutionality of random drug testing even prior to the Supreme Court decisions. Finding that the rationale for a warrantless administrative search, typically limited to *places*, was justifiably applicable to *people*, the court held that the random drug testing of licensees involved in horse racing was constitutional on its face and legal in its application. The administrative search exception to the warrant requirement was deemed justified considering the "strong state interest in conducting an unannounced search" (based upon its interests in assuring the public's perception of integrity) and the reduced expectation of privacy of the licensees (in light of the pervasive regulation of the industry). Although not expressly stated, the court's rationale for not

requiring individualized suspicion appears to be premised upon a sufficient limitation of the discretion that could be exercised by the racing commission in directing a licensee to submit to a drug or alcohol test. Because *all* jockeys were required to take a breathalizer test, the court found that there was no room for standardless discretion. Furthermore, because the daily selection of jockeys to be subjected to urine testing was by lottery, the court distinguished those cases that left the selection of the targets of random searches to a field officer's discretion with no limiting guidelines.[7] Citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 564-66 (1976), where the search of individuals at a particular checkpoint selected by officials responsible for allocating law enforcement resources was deemed valid, the court held that the daily selection by lot of jockeys to be subjected to urine testing does not violate the Fourth Amendment.

The validity of randomly administering drug tests to individuals licensed by a racing commission absent any suspicion of wrongdoing was upheld by the Seventh Circuit in *Dimeo v. Griffin*, 943 F.2d 679 (7th Cir. 1991). As did the Supreme Court in *Von Raab* and *Skinner*, and as did the Third Circuit in its more truncated analysis in *Shoemaker*, the Seventh Circuit engaged in a "judgmental, forward-looking, balance-striking, probabilistic assessment" to determine "where the Fourth Amendment should be deemed to strike the balance between the interests of the state in using drug testing as a regulatory instrument and the interests of persons in preserving their physical privacy." 943 F.2d at 681. To accomplish this end, the court compared the privacy interests involved in providing a urine specimen for testing with the state's interests − both the overwhelming concerns of the Illinois Racing Board regarding the personal safety of those who participate[8] and the state's financial concerns regarding the tax revenues generated from horse racing. The court noted that the loss of privacy is "incremental" and that if the increment is slight, the burden on the

---

[7] *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 661 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 882-84 (1975).

[8] The court stated that "horse racing is the most dangerous of the common sports, other than automobile racing." As an example, the court noted that, on the average, two jockeys are killed every year and another 100 are seriously injured. 943 F.2d at 683.

state of establishing the need for the rule is correspondingly lightened. Finding that in horse racing cases (unlike any other cases involving random drug testing, such as government employees and transportation workers) the incremental invasion of privacy is very slight when compared to the physical dangers of horse racing and the financial interests of the state, the court held:

> When we compare the plausible dangers, both to safety and to revenue, that the challenged rule aims to combat with the very moderate incremental infringement of privacy that the rule brings about, we conclude that the rule is not unreasonable, and therefore that it does not violate the Fourth Amendment.

943 F.2d at 684.[9]

A similar balancing test recently was applied by the Sixth Circuit in *Carrelli v. Ginsberg*, 956 F.2d 598 (6th Cir. 1992), regarding a drug-testing regulation of the Ohio State Racing Commission that, unlike the regulations at issue in *Shoemaker* and *Dimeo*, required a showing of "reasonable cause" prior to licensees' being directed to submit a sample of their urine.[10] The court found that the licensees' awareness that they were subject to drug testing, together with the fact that the licensees in horse racing were heavily regulated, diminished their expectation of privacy. This factor, as well as Ohio's legitimate interests in the safety of those involved in

---

[9] The Seventh Circuit distinguished its earlier decision in *Serpas v. Schmidt*, 827 F.2d 23 (7th Cir. 1987), its other Fourth Amendment case dealing with horse racing, in which the court held that random searches of the living quarters of grooms, hot walkers, and others ("backstretchers") who live in bunk houses above the stalls occupied by race horses on the grounds of a race track, were violative of the Fourth Amendment. The court noted that such a search constituted a greater invasion of privacy, and that the interests of the state were weaker. 943 F.2d at 684.

[10] After Carrelli, who was licensed as a trainer of thoroughbred race horses, was directed to provide a urine specimen, the Ohio State Racing Commission promulgated a regulation providing for random drug testing. Carrelli was deemed not to have standing to challenge the random drug testing provision. 956 F.2d at 602 n.8.

horse racing and the integrity of the horse racing industry, led the court to hold that the Fourth Amendment was satisfied.

*Holthus v. Louisiana State Racing Commission*, 580 So. 2d 469 (La. App. 1991), is the only state court decision subsequent to *Von Raab* and *Skinner* that addresses the constitutionality of subjecting horse racing participants to random, suspicionless drug testing.[11] There, a regulation provided that all licensees, except owners who were not trainers (and therefore, typically, did not come in contact with the horse), were subject to random drug testing. Adopting the *Shoemaker* and *Dimeo* reasoning, the court upheld the regulation, taking particular note that "Louisiana has a vital interest in maintaining the integrity of the horse racing industry which requires close and constant supervision in order to avoid the spread of corrupt, dishonest and unprincipled horse racing practices." 580 So. 2d at 470.

# IV

## Proposed Regulatory Changes

It is our opinion that the interests of the State – the integrity of horse racing, the economic benefits derived by the State, and the

---

[11] Just *prior* to the decisions in *Von Raab* and *Skinner*, the Supreme Court of Massachusetts, declining to follow the administrative search exception relied upon by the Third Circuit in *Shoemaker*, held that the random drug testing of Massachusetts State Racing Commission licensees was violative of the Fourth Amendment. *Horsemen's Benevolent and Protective Association, Inc. v. State Racing Commission*, 532 N.E. 2d 644 (Mass. 1989). In reaching this conclusion, the court found that the privacy considerations attendant to rendering a urine specimen outweighed the "laudable concerns" of the State Racing Commission regarding the deterrence of illegal drug use at Massachusetts race tracks, the safety of the licensees, and the integrity of the industry. Based upon the Massachusetts Constitution, the court also held that the drug testing provision requiring "reasonable suspicion" also was invalid; such testing could only be conducted if premised upon the requisites of probable cause, the court held.

safety of those who participate in the sport – generally outweigh the diminished privacy interests of the Commission's licensees.[12]

Not *all* licensees may be subject to random, suspicionless drug testing, however. In *Von Raab*, the Supreme Court held that random drug testing of customs agents who have access to classified information (in addition to those involved in the interdiction of drugs and those who carry firearms), may be subjected to random drug testing. However, because the U.S. Customs Service sought to apply its random testing program to categories of employees who might not come into contact with classified materials (*e.g.*, mail clerks and repairmen), the Supreme Court remanded the case to the lower court to determine if this category of employees was defined too broadly. 489 U.S. at 678.

Similarly, the rationale and justification for random, suspicionless drug testing of the Commission's licensees is applicable only to those who come in direct contact with the horse regarding either its training for, or participation in, a race. Other licensees of the Commission who, typically, do not come in contact with the horse (*e.g.*, owners, jockey agents, catering personnel, and maintenance personnel) may not be subject to random drug testing. In regard to these licensees, a finding of individualized suspicion to believe that the licensee may have used, or is under the influence of, an illegal drug, is a prerequisite to drug testing.

---

[12] The Commission could further bolster the reasonableness of drug testing regulations by minimizing the licensees' loss of privacy. 74 *Opinions of the Attorney General* 119, 127 (1989). For example, the Commission may consider, if feasible, provisions allowing the licensee to urinate in private, rather than in the presence of an observer; guaranteeing the licensee confidentiality of the results, except for the use of a positive finding to pursue administrative objectives; and testing only for illegal drugs, and not for any other medications that may be lawfully used by the individual licensee.

## V

## Conclusion

In summary, it is our opinion that random, suspicionless drug testing of those who come in contact with a horse on the race track grounds is permitted by the Fourth Amendment. With regard to those licensees who do not fit into this category, the Fourth Amendment allows a urinalysis drug test only on the basis of individualized suspicion.

J. Joseph Curran, Jr.
*Attorney General*

Bruce C. Spizler
*Assistant Attorney General*

Jack Schwartz
*Chief Counsel*
  *Opinions & Advice*